UNITED STATES of America, Plaintiff,

v.

BRISTOL–MYERS COMPANY, Beecham Group Limited, and Beecham, Inc., Defendants.

Civ. A. No. 822–70.

United States District Court, District of Columbia.

May 21, 1979.

See also, D.C., 82 F.R.D. 647, and D.C., 82 F.R.D. 652.

David I. Shapiro, James vanR. Springer, Washington, D.C., for City, County and State plaintiffs.

Thomas H. Liddle, III, Antitrust Division, U.S. Dept. of Justice, Washington, D.C., for plaintiff, the United States.

Arnold Bauman, Robert F. Dobbin, New York City, for defendants, Beecham Group Limited and Beecham Inc.

Jerome G. Shapiro, Alan H. McLean, New York City, Philip A. Lacovara, Washington, D.C., for defendant, Bristol-Myers Co.

## ORDER

CHARLES R. RICHEY, District Judge.

The Court now has before it a proposed consent decree which would dismiss this action by the United States against defendants Beecham Group, Ltd., and Beecham, Inc., (the Beecham defendants), as provided in Fed.R.Civ.Proc. 54(b). Pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(e) and (f), the Court has caused notice of the proposed judgment and the Justice Department's Competitive Impact Statement to be published in the Federal Register[1] and in the Washington Star.[2] In response to this publication, comments were received from Ayerst Laboratories, which is a division of American Home Products Corp., and from a group including Professor John C. Sheehan, Arthur D. Little, Inc., and Massachusetts Institute of Technology. These comments and the government's responses to them were also published in the Federal Register.[3] In addition, the Court has before it substantive and procedural objections to the settlement which have been filed by Bristol-Myers Company, the remaining non-settling defendant in this litigation.[4] On February 28, 1979, a hearing was held in this Court concerning these comments and objections, to enable the Court to determine whether the entry of the proposed consent judgment is in the public interest.

Another proposal for settlement, between the Beecham defendants and the city, county, and state plaintiff classes (CCS plaintiffs), was submitted to the Court at about the same time as this one. That settlement is dependent upon the Court's approval of the government's case against Bristol. It is, of course, a major aspect of Beecham's incentive to enter into either settlement

---

1. Publication in the Federal Register took place on November 3, 1978. (43 Fed.Reg. 51,45451,-467.)

2. A summary of the terms of the Proposed Final Judgment, Stipulation and Competitive Impact Statement was published as an advertisement in the *Washington Star*, a newspaper of general circulation in the District of Columbia, on November 6, 7, 8, 9, 10, 11, and 12, 1978.

3. The 60-day comment period prescribed by 15 U.S.C. § 16(b)–(d) commenced on November 6, 1978, and ended on January 5, 1979. Copies of the comments and the government's responses thereto were published in the Federal Register on February 8, 1979. (44 Fed.Reg. 8030–8037).

4. Some of these objections interface with the arguments Bristol has raised in support of its Motion to Amend, and are dealt with more thoroughly in the Court's disposition of that Motion, which is issued of even date herewith. Bristol's objections and the government's response thereto were also published in the Federal Register on February 8, 1979. (44 Fed. Reg. 8037–8040).

that the Court's approval of both will effectively eliminate its participation in this litigation.

This civil antitrust suit was filed by the government on March 19, 1970. It alleged that the Beecham defendants and Bristol-Myers Company violated Sections 1 and 2 of the Sherman Act by: (1) combining and conspiring to monopolize and restrain trade in semisynthetic penicillins, (2) actually monopolizing trade in a particular semisynthetic penicillin called ampicillin, (3) fraudulently procuring and enforcing a United States patent on ampicillin,[5] (4) restrictively licensing and granting rights under the ampicillin and other semisynthetic penicillin patents and (5) restraining the sale of semisynthetic penicillins in bulk form, generically, or under any trademark or trade name other than a licensee's own trademark or trade name. The complaint alleges that the ampicillin patent and another patent claiming another form of ampicillin are both invalid on statutory grounds (35 U.S.C. §§ 102, 103, and 112). Finally, the complaint alleges that the government was overcharged on its direct and indirect purchases of ampicillin as a result of these violations.

The alleged violations were accomplished primarily through a series of agreements executed in 1959 and 1960 by which Beecham and Bristol exchanged patent rights and commercial information concerning semisynthetic penicillins. Under the agreements Bristol received an exclusive license to use and sublicense Beecham's ampicillin patent and other patents relating to semisynthetic penicillins for sale in the United States. Bristol was to pay royalties on its sales of licensed products in bulk form at twice the rate for royalties for sales in dosage form. Beecham retained the right to sell the licensed semisynthetic penicillins in the United States only in dosage form and under its own trademarks. To circumvent these restrictions, Beecham licensed a number of companies to market only Beecham-supplied ampicillin under Beecham-owned trademarks.[6] In exchange for the patent licenses, Bristol aided Beecham by jointly prosecuting several patent applications which were licensed to Bristol under the 1959 agreement. It is alleged that Beecham and Bristol improperly failed to advise the patent office of a prior art reference, delayed publication of an article concerning the reference that would have warranted the patent's rejection, and failed to advise the Patent Office of the exact nature of certain experiments reported in affidavits submitted in conjunction with a patent application.

The proposed consent judgment provides for the dismissal of the government's case only against the Beecham defendants. The remaining defendant is Bristol-Myers Company. The government will continue to prepare for trial of this case in cooperation with the other remaining plaintiffs against Bristol. This consent judgment provides for financial, injunctive, and other equitable relief against the Beecham defendants. The equitable relief is intended to further two important goals: to encourage competition in the semisynthetic penicillin market by eliminating much of Beecham's participation in the alleged anticompetitive practices,[7] and to simplify trial of the case

5. Ampicillin is claimed in U.S. Patent No. 2,985,648, which issued to Beecham on May 23, 1961. That patent expired on May 23, 1978.

6. This licensing is the subject of Section VIII of the consent decree, which requires Beecham to continue these licenses, with the exception of that of Penbriten, without royalties.

7. Certain limitations on the relief that Beecham is now in a position to provide are imposed because of the agreements between Beecham and Bristol that are challenged in this litigation. For example, compulsory patent licensing is not a part of the relief against Beecham be-

cause Beecham may not license any of the patents covered by the 1959 agreement with Bristol; Beecham's right to sublicense was given up to Bristol under that agreement. Similarly, Beecham is contractually barred by its 1959 and 1967 agreements with Bristol from selling ampicillin and other semisynthetic penicillins in bulk form under a trademark other than a Beecham trademark or outside the drug trade. The injunctive provisions of the judgment therefore provide for limited relief which will work around these challenged agreements. The judgment would require Beecham to

against Bristol by eliminating Beecham as a party and by Beecham's cooperation in government discovery concerning the alleged conspiracy.

The provisions for injunctive relief, compulsory sales and patent licensing for ampicillin and other semisynthetic penicillins may be the most important portions of the consent decree. A summary of the decree's major equitable provisions follows:

Section IV of the decree prohibits Beecham from entering any agreements for ten years which restrain any other parties from selling prescription drugs in any form, under any name, or to any person, of their free choice. Section V requires Beecham to sell ampicillin and other semisynthetic penicillins in bulk form, totalling up to 15 percent of Beecham's yearly U.S. sales to anyone other than Beecham subsidiaries, for ten years, if Beecham is then selling the requested drug in the United States, and has the right to sell it in bulk form in the United States. If it is otherwise commercially unavailable in the United States, Beecham must make similar sales of a necessary component of ampicillin called 6–APA.[8] Sections VI and VII require Beecham to grant to all applicants except Bristol covenants not to sue for violations of any U.S. ampicillin patent or other patents licensed to Bristol under the 1959 agreement, at no charge beyond what Beecham must pay in royalties to third parties. Non-ampicillin semisynthetic penicillin patents may be licensed by Beecham at reasonable royalty rates, but patents used in conjunction with the ampicillin patent must be licensed without charge. Technical data and know-how related to any semisynthetic penicillins, which was possessed by Beecham before the date of the decree, must be provided without charge, except for costs of copying and royalties paid to third parties.[9]

Section VIII requires Beecham to authorize the use of Beecham-owned trademarks previously used exclusively by American-owned companies, without royalties and for sales of ampicillin purchased from suppliers other than Beecham. If Beecham acquires the right to sell the semisynthetic penicillins involved under trademarks other than its own, or a court determines that the agreements restricting Beecham's right to sell are unenforceable, Beecham would be required to assign the trademarks in question to the companies using them.[10] The trade-

license the patents and to sell in bulk form if those agreements are amended to allow it to do so, or if it is determined that such agreements are unenforceable.

8. Compulsory bulk sales are necessary to ensure at least some domestic source of ampicillin. This is especially important for generic drug sellers that do not have their own manufacturing capacity, for those drugs for which the United States sales volume is not large enough to warrant foreign producers to undertake the cost of FDA approval and certification, and for drugs claimed in patents owned by someone other than Beecham, which Beecham has the right to sell but not to sublicense.

9. The covenants not to sue prevent Beecham from profiting further from the allegedly fraudulently procured patent and conspiracy to restrain trade. Beecham is required to grant such covenants concerning patents licensed to Bristol only so long as this action is pending against Bristol. This provision is intended to ensure that while Bristol may not sue to enforce these patents for its own benefit because of this litigation, Beecham may not sue to enforce the same patents for Bristol's benefit.

These provisions expressly exclude the drug amoxicillin and information relating to it, although amoxicillin may be within the definition of semisynthetic drugs which is the basis of this suit. Amoxicillin patents and their ownership are the subject of other litigation now pending before this Court. *In re: Amoxicillin Patent and Antitrust Litigation,* M.D.L.Docket No. 328, Misc. 78–0145. In any case, the amoxicillin market is already more competitive than the ampicillin market has been, since several companies are currently making amoxicillin without express Beecham patent licenses. (These include Bristol Biocraft, A. H. Robbins, Parke-Davis, Squibb, and Wyeth.) Furthermore, compulsory licensing of amoxicillin may not be necessary because ampicillin may be expected to offer increased competition for amoxicillin in the competitive market which will be made possible by this decree.

10. The trademarks in question, except Penbriten, are Beecham trademarks only in name. To avoid the restrictions of the 1959 Bristol agreement restricting it to sales of semisynthetic penicillins under its own name, Beecham allowed its customers to select trade names to be used by them. Beecham then registered these names in the patent office and authorized the

mark Penbriten is excepted from this provision on the ground that it was used by Beecham as a bona fide trademark for marketing in the United States prior to its licensing to another company.[11]

The government's Competitive Impact Statement regarding this settlement has not been challenged in substance by anyone. That statement indicates that the decree's provisions for injunctive relief, compulsory sales and licensing of semisynthetic penicillins, will give the government most of the relief against Beecham requested in its complaint which Beecham is now in a position to give. The relief should inject competition into the semisynthetic penicillin market. By ensuring a ready source of bulk sales, drug sellers without manufacturing capabilities will be able to enter the market or remain competitors. The patent licensing and covenant-not-to-sue provisions will assure that Beecham does not profit further from the allegedly fraudulent patents or the challenged agreements concerning them. The trademark licensing provisions will ensure that those competitor drug companies which have invested in the development of trademarks issued to Beecham pursuant to the challenged agreements will have the full use and benefit of those trademarks without further payments to Beecham. The cost of marketing semisynthetic penicillins by these competitors will be reduced. The combined effect of these provisions is to give any applicant access to patents, trade names, and commercial and technical information necessary to manufacture and sell semisynthetic penicillins. These provisions should eradicate the effects of the challenged 1959 and 1967 Beecham and Bristol agreements, thereby increasing the market shares of present competitors and easing entry into the semisynthetic penicillin market.

In addition to these equitable provisions, Section XV of the consent decree requires Beecham to pay the United States $1 million within 60 days of the entry of the consent decree. This amount will be in discharge of all the government's damage claims based on direct and indirect purchases of ampicillin and other semisynthetic penicillins, including expenditures under welfare programs.

Although the case against Beecham is dismissed pursuant to this consent decree, the case against its alleged co-conspirator, Bristol-Myers, remains pending. The decree will simplify the government's task in preparing and trying its case against Bristol through the cooperation of Beecham. Section XVII (which incorporates Appendix A) of the decree, gives the government certain rights to additional discovery against Beecham. These include rights to informally interview and depose Beecham employees and former employees, as well as access to those individuals needed as trial witnesses. Because Beecham is a foreign corporation, its dismissal without these provisions might make it difficult to compel attendance of these witnesses at deposition or trial. In exchange, the government has agreed to attempt to minimize the burden of additional discovery on Beecham, and to use deposition testimony at trial wherever possible. Discovery pursuant to these provisions is already underway. Under the Court's order of December 6, 1978, informal interviews and depositions of Beecham employees pursuant to these sections of the decree were completed by April 9, 1979.[12]

use of these trademarks only for sales of Beecham-supplied ampicillin. Each customer promoted and marketed the drugs supplied by Beecham, and developed goodwill associated with it under the trade name owned by Beecham. This insulated Beecham from competition from other suppliers in sales to its customers of those drugs sold under Beecham-owned trade names. By requiring Beecham to authorize the use of these names by the customers who have invested in them, the semisynthetic pencillin market will be opened up to further competition.

11. Ayerst Laboratories, which has sold ampicillin under the Penbriten trademark since the early 1960's, objects strongly to this exclusion. See *infra*.

12. This was the date set for the hearing on the proposed settlement between Beecham and the CCS plaintiffs. The continuing discovery provisions in the government and CCS settlements are identical. As in the government case, the CCS plaintiffs will continue to litigate their case against Bristol.

In making its determination as to whether this settlement is in the public interest, the Court is authorized to consider:

(1) the competitive impact of such judgment, including termination of the alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing on the adequacy of such judgment;

(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(e).

This case was filed in 1970. Since that time, there have been extensive changes in the semisynthetic penicillin market, which have injected some competition into that market, and lowered prices for ampicillin and its substitutes. In particular, the marketing of amoxicillin in America by companies without unchallenged Beecham licenses has made available a substitute for ampicillin, thereby lowering the prices charged by Beecham and Bristol. The challenged ampicillin patent has already expired, and can no longer be enforced by Beecham or Bristol to prevent new competitors from entering the ampicillin market. However, the structure of the semisynthetic penicillin market has to this date been largely dictated by the lingering effects of the challenged 1959 and 1967 agreements between Beecham and Bristol. No relief, in this or any other case, has reduced the effects of those agreements. Under these circumstances, one of this Court's primary considerations in assessing this settlement has been the public interest in obtaining some financial and equitable relief now rather than later.

This settlement proposal is the culmination of years of efforts on the part of attorneys for the government, CCS and private plaintiff classes, and the defendants, to achieve global or partial settlements. At this advanced stage in the litigation and particularly because of the non-settling posture of Beecham's co-defendant, it appears that a probable alternative to this settlement would be for the government to proceed to try this case against both Beecham and Bristol. Continued litigation would pose substantial risks as well as additional costs. Furthermore, a delay of several years in obtaining any relief would be necessary to complete discovery without Beecham's assistance, to try the case, and to dispose of appeals after trial. It is clear that the immediate positive competitive impact of this relief more than justifies the compromises which have been made. The public benefit which might enure from a full trial of the case and public disclosure of the Beecham-Bristol relationship, will be achieved in any case by a trial of the case against Bristol. This settlement thrice benefits the public by immediately effecting market changes, by achieving some immediate compensation for damages, and by increasing the likelihood of further relief against Bristol through the cooperation of Beecham witnesses.[13]

The most extensive objections to the entry of this decree have been raised by Beecham's co-defendant, Bristol-Myers. Bristol objects to the Court's entry of a Rule 54(b) final judgment. Bristol contends that the government and Beecham have not shown sufficient need for the entry of a Rule 54(b) judgment now. Bristol urges that the entry of such a judgment would prejudice it because Beecham is a foreign corporation and many of its personnel are beyond the subpoena power of the Court. Once the

---

**13.** The Court is aware, from previous settlement proposals involving both Beecham and Bristol that Bristol may be considered responsible for a much larger portion of estimated damages than Beecham. For example, of a global settlement offer (from both defendants to all plaintiffs, including the government), of $21.5 million, $5 million was to be paid by Beecham, and $16.5 million by Bristol.

government's case against Beecham is dismissed, if the tandem CCS settlement with Beecham is also approved, Bristol fears that this Court will no longer have jurisdiction over Beecham.[14] In particular, Bristol fears that this dismissal will make it difficult or impossible for it to conduct further discovery against Beecham and Beecham employees. Bristol contends that this discovery will be necessary to the defense of its case. Furthermore, Bristol objects to the portions of the decree which provide for continued discovery by the government and the CCS plaintiffs against Beecham, and for Beecham's participation on behalf of the government at any trial of this case against Bristol. These provisions, Bristol urges, would violate its rights to due process of law by granting the government "unfair procedural advantages" in prosecuting the case against Bristol. Bristol suggests that if the Court enters this decree, it should be conditioned on Beecham's agreement to subject itself to the jurisdiction of the Court for discovery and trial witness purposes.

Bristol's procedural objections to the entry of the decree are at this time largely moot. This Court's order of December 6, 1978 required the plaintiffs' informal interviews of Beecham personnel to be completed no later than January 15, 1979. Those interviews were followed by depositions of Beecham personnel, at which attorneys for Bristol were present. These depositions have already been completed. Under the terms of the government and CCS settlements, certain Beecham witnesses will also be made available for trial.[15] Many of the witnesses made available by Beecham are

British citizens who are not in positions of management or control over the corporations. Other witnesses are no longer employed by Beecham. Witnesses made available by Beecham might not have been available to the plaintiffs or Bristol without Beecham's cooperation.

Because this case involves an allegation of conspiracy between Beecham and Bristol, Beecham witnesses will be important for the government's prosecution of the case against Bristol as well as for Bristol's defense. Since all parties will have some access to witnesses who would otherwise not have been available, the primary advantage of the decree's discovery provisions to the government and the CCS plaintiffs also accrues to Bristol's benefit.

The decree's provisions for the availability of trial witnesses, and the extensive depositions of Beecham employees which have already taken place pursuant to the Court's December 6 order assure adequate access to Beecham witnesses. The witness availability concerns in support of which Bristol has cited *Hudson Engineering Co. v. Bingham Pump Co.*, 298 F.Supp. 387 (S.D.N.Y.1969) and *duPont Glore Forgan, Inc. v. Arnold Bernhard & Co.*, 73 F.R.D. 313 (S.D.N.Y. 1976) have been accommodated in this case. Once Beecham has been dismissed from this case, Bristol will have access to Beecham witnesses as it would to any third party witnesses. This availability will be adequate because of the benefit already reaped by Bristol from the plaintiffs' settlement discovery provisions. Under these circumstances, it appears that Bristol's concern with the fairness of the settlement's discovery provisions is a disingenuous expres-

---

**14.** The Court need not now decide the extent of its jurisdiction over Beecham for purposes of discovery after the dismissal of the government and CCS cases against it, or whether Beecham will be subject to suit anywhere in the United States for the assertion of claims by Bristol. However, it appears that Beecham Group may be suable in New Jersey through its wholly owned subsidiary, Beecham, Inc., which is a New Jersey corporation, or in New York as a party to the 1959 contract, which was executed there. *See* Order denying Bristol's motion to amend.

**15.** In its papers in support of this settlement, the government has assured the Court that it does not intend to call any Beecham witnesses at trial whom it has not formally deposed prior to trial. In light of this representation, it appears highly unlikely that the plaintiffs will attempt to surprise Bristol at trial with a witness who has been informally interviewed by the plaintiffs, but to whom Bristol has not had prior access at deposition. If such a situation does arise, the Court feels competent to deal with it at that time.

sion of its reluctance to remain as the sole defendant in this case.

Bristol also advances a substantive objection to that portion of the decree which would require Beecham to make compulsory sales of the ampicillin component 6–APA under certain circumstances. (Section V). Bristol urges that it has the exclusive right to make such sales in the United States under the Beecham-Bristol agreements. Therefore, Bristol contends that this portion of the decree would require Beecham to infringe Bristol's 6–APA patent rights. In addition, Bristol argues that third parties may be encouraged to infringe the 6–APA patent because of Beecham's covenant not to sue.

This objection concerns the contractual relationship between Bristol and Beecham. Certainly, under ordinary circumstances, the Court would be reluctant to interfere with the rights of any party to a valid contract. However, in this case it appears that the risk of such interference is remote. 6–APA is now available elsewhere, and will probably continue to be available. Since the settlement requires Beecham to sell it only if it becomes otherwise commercially unavailable, as a practical matter Beecham will probably never be required to sell it under the decree. Furthermore, the validity of the agreement under which Bristol claims the 6–APA patent right is at issue in this litigation. It is not clear that the sales which would be required of Beecham would violate the Bristol-Beecham agreement in any case, since some Beecham sales are permissible under it. If a violation of the contractual agreement occurs, Bristol may seek its appropriate remedy against Beecham. Because of the questionable nature of Bristol's rights under its agreements with Beecham, the Court is impelled to acknowledge Beecham's acceptance of this risk as a legitimate choice made by Beecham as part of its settlement deal.

In sum, Bristol's procedural and substantive objections to this settlement are directed toward Bristol's interests as a litigant and as a party to contracts with Beecham (which are challenged in this litigation). Except in the most general way, none of these objections affect the balance of the public's interest in effecting this settlement. The Court is wholly unpersuaded by the suggestion that it enter an order less final than one under Rule 54(b), or dismissing Beecham conditionally. Bristol is perfectly well aware, as is this Court, that Beecham and the government have bargained only for Beecham's dismissal from this litigation.[16] For the Court to approve anything less than a final judgment under Rule 54(b) would be tantamount to disapproval of the settlement. The objections raised by Bristol on its own behalf certainly do not warrant depriving the people (or Beecham) of the benefit of this bargain.

The Court is more sympathetic to the substantive objections to specific portions of the decree raised by Ayerst Laboratories. Ayerst is one of those ampicillin distributors which has marketed Beecham-supplied ampicillin under a Beecham-registered trade name in the United States. Ayerst complains because Article VIII of the judgment requires Beecham to assign its ampicillin trademarks to their current users without charge, except the Penbriten trademark, which has been used by Ayerst. This means that Ayerst must continue to pay Beecham royalties for use of the Penbriten trademark, and to use that trademark only for Beecham-supplied ampicillin. Ayerst's competitors will now be able to use their Beecham trademarks without royalties for ampicillin purchased from Beecham and elsewhere.

Although Penbriten was originally used in a joint venture in the United States by Ayerst and Beecham, only Ayerst has marketed ampicillin under the Penbriten trademark in this country since 1969. Ayerst argues that it cannot practicably market ampicillin under any other trademark or without a trademark without losing its substantial investment in the Penbriten name. If it continues to use the Penbriten designa-

---

16. Of course, certain sections of the decree provide for reopening of the Court's jurisdiction for supervision and enforcement of its terms. *See* Section XIII.

tion, however, it must continue to pay royalties to Beecham and buy ampicillin at Beecham's price. Ayerst will therefore be competitively disadvantaged in relation to users of other ampicillin trademarks. Ayerst argues that serious anticompetitive consequences in the semisynthetic penicillin market will result from this disadvantage to it. Thus, the public interest in this settlement will be adversely affected. Ayerst contends that these consequences are especially unjustified because it sees no reason to distinguish the treatment of Penbriten from the other Beecham names.

Unlike any other Beecham ampicillin trademark, the Penbriten name was originally used by Beecham as its "flagship" name to market ampicillin in a number of countries. Beecham registered Penbriten in the United States three years before any use of the name by Ayerst. Prior to 1969, Beecham as well as Ayerst invested in the Penbriten trademark in the United States. Although only Ayerst now uses the name, it seems clear that Penbriten was not originally registered by Beecham as a means of avoiding the effects of its agreement with Bristol. Rather, Beecham has used and invested in Penbriten as a bona fide trademark. Under these circumstances, it would be unfair to require Beecham to divest itself of the trademark without compensation.

Alternatives to the exclusive use of the Penbriten trademark will become available to Ayerst as a result of this settlement. Reduced advertising and promotion costs and lower purchase prices from Beecham's competitors should enable Ayerst to effectively market ampicillin without a trademark. This is especially true in markets such as the institutional bid market, where brand names are less important. Of course, Ayerst could invest in the development of another trademark or attempt to renegotiate its contractual relationship with Beecham.

Ayerst's situation as a result of Penbriten's exception from the royalty-free trademark licensing provisions of this decree is indeed unfortunate. The Court recognizes that Ayerst's private interests may be damaged. Some compromise alteration of Ayerst's contractual relationship with Beecham might be more fair to Ayerst than the total exclusion of Penbriten from the settlement's relief. However, viable options, based on changes in its marketing practices which will permit it to remain in the ampicillin market, remain open to Ayerst. The harm to Ayerst may well result in some adverse effect on the public interest in competition in the semisynthetic penicillin market, by reducing Ayerst's ability to sustain a substantial market share. However, any anticompetitive effect of Ayerst's marketing disadvantage will be outweighed by the positive effect of this settlement on competition in the market as a whole. In addition, the exception of Penbriten from the decree's provisions is based upon appropriate deference to Beecham's legitimate interests in a bona fide trademark developed in part for its own use. Under these circumstances, the Court believes that it would be unwise to jeopardize this settlement by imposing on Beecham a modification of the terms concerning the use of the Penbriten trademark to achieve a marginal pro-competitive effect on Ayerst's ability to remain an important competitor without changes in its marketing practices.

Finally, Professor John Sheehan and the Massachusetts Institute of Technology seek modifications of this judgment and the government's Competitive Impact Statement. These objections are based on several references to U.S. Patent No. 3,159,617 in the CIS. This patent is issued to Dr. Sheehan, who had previously assigned the patent application to Arthur D. Little, Inc. ("Little"). Little, in turn, granted Bristol an exclusive license, including the right to grant sublicenses, and Bristol granted Beecham a non-exclusive sub-license under the patent. Dr. Sheehan also objects to the broad definition of "semisynthetic penicillin patents" in the judgment (Art. II(L)), which embraces this patent as well as other patents which Beecham has no right to sublicense. Dr. Little requests that these references be deleted to remove any possible ambiguity as to the ownership of the patent.

First, the judgment clearly indicates that Beecham is not required to grant any patent licenses except as to patents which it has the right to license. Since it is clear that Beecham has no such right with regard to the Sheehan patent, the decree is unambiguous. Any harm done by virtue of the publication in the Federal Register has already occurred. Since the Sheehan objections and the government's response thereto have also been published, any remedial effect will also have been accomplished. It would seem unwise to narrow the judgment's definition of semisynthetic penicillin patents, because to do so would require a present determination as to what patents Beecham has the right to license.

In sum, Ayerst Laboratories and Dr. Sheehan have suggested certain modifications which might increase the fairness to them as private parties, thereby marginally amplifying the public interest in the approval of this settlement. However, other considerations outweigh these arguments for alteration of the settlement. These arguments, like those of Bristol-Myers, focus on particular provisions of the decree and their impact on the private interests of the commentators. This settlement is clearly the result of hard, arm's-length negotiations by able representatives of the government. It offers substantial benefits to the public. No comment or objection to the entry of this decree affects in any way the Court's initial determination that this settlement is fair, reasonable and adequate, and in the public interest within the meaning of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16. The settlement agreement entered into between Beecham Group, Ltd., Beecham, Inc., and the United States of America will therefore be adopted and approved by the Court. There being no just reason for delay, the final judgment consented to therein will be entered of even date herewith.