## In re AMPICILLIN ANTITRUST LITIGATION.

**M.D.L. Docket No. 50. Misc. No. 45–70.**

United States District Court,
District of Columbia.

Oct. 29, 1981.

David I. Shapiro, James vanR. Springer, Sallie H. Helm, Arthur J. Galligan, Peter W. Morgan, Daniel Stark, Dickstein, Shapiro & Morin, Washington, D.C., Lee A. Freeman, Lee A. Freeman, Jr., Freeman, Rothe, Freeman & Salzman, Chicago, Ill., Robert A. Hammond, III, Washington, D.C., Michael Spiegel, Patricia Cutler, Deputy Attys. Gen., San Francisco, Cal., George Deukmejian, California Atty. Gen., Sacramento, Cal., Linda Aaker, Asst. Atty. Gen., Austin, Tex., Mark White, Texas Atty. Gen., Austin, Tex., Steven J. Greenfogel, Alan L. Kovacs, Francis X. Bellotti, Massachusetts Atty. Gen., Boston, Mass., H. Laddie Montague, Jr., Warren D. Mulloy, Merrill G. Davidoff, Berger & Montague, Philadelphia, Pa., Jerry S. Cohen, Herbert E. Milstein, Michael D. Hausfeld, Kohn, Milstein & Cohen, Washington, D.C., Mark I. Harrison, Harrison, Myers, Singer & Lerch, P.C., Phoenix, Ariz., Thomas L. Boeder, John H. Bright, John R. Ellis, Seattle, Wash., Kenneth O. Eikenberry, Washington Atty. Gen., Olympia, Wash., Jack L. Chestnut, Floyd E. Boline, Thomas M. Stringer, Chestnut & Brooks, P.A., Minneapolis, Minn., for CCS plaintiffs.

Jerome G. Shapiro, Susan L. Thorner, Alan H. McLean, New York City, for Bristol-Myers Co.

Robert Dobbin, Richard Whiting, Daniel Plaine, Washington, D.C., for Beecham Group Ltd. and Beecham Inc.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

The Court has before it eleven[1] applications for attorneys' fees and costs to be paid from the $7,300,000.00[2] fund created from the settlement of the claims of the plaintiff classes composed of cities, counties, states, and other political subdivisions ("CCS") against the defendants, Beecham, Inc., Beecham Group ("Beecham"), and Bristol-Myers. On September 21, 1981, immediately after the presentation of evidence concerning the fairness of the Bristol settlement and the interstate allocation of the funds, the Court heard arguments in support of the fee applications, with no opposition thereto. Having heard no opposition to the settlement, and having determined from the papers and the representations of counsel that the settlement was fair, reasonable and adequate, the Court issued an Order on October 2, 1981, approving the settlement and the interstate allocation of the settlement funds.

## BACKGROUND

This litigation commenced with the filing of the civil complaint of the United States Department of Justice on March 19, 1970. That complaint alleged that Bristol-Myers Company and the Beecham companies had violated Sections 1 and 2 of the Sherman Act in the manufacture, marketing and sale of ampicillin and other semisynthetic penicillin products. The complaint also challenged the validity of certain patents owned by the defendants and the legality of certain agreements relating to those patents.

The federal complaint was followed by the filing of private treble damage actions in several jurisdictions. These included actions brought as class actions on behalf of various CCS plaintiffs, on behalf of consumers, and on behalf of wholesale and retail druggists and non-governmental hospitals ("WRPH"), as well as claims filed on behalf of two competitor plaintiffs.

By Order of July 22, 1970, the Judicial Panel on Multi-district Litigation transferred all of the cases to the District of Columbia for pretrial purposes. Other "tag-along" cases were later transferred here. The cases were originally assigned to former Chief Judge Sirica (now Senior Judge), and were later reassigned to this Judge some three years later.

On April 16, 1978, Bristol offered $6 million for settlement of the claims based on both direct and indirect purchases of the WRPH classes. On June 16, 1978, Beecham offered $1.93 million for a similar settlement with the WRPH class. After a hearing on June 16, 1978, the Court approved the proposed form of notice and set September 29, 1978, as the date for a hearing on whether the settlement was fair, reasonable and adequate. The WRPH settlement agreement was found fair, reasonable and adequate and was approved by the Court on October 20, 1978. With the exception of the issues of attorneys' fees and distribution of the settlement fund, that settlement eliminated seven cases from the *Ampicillin* litigation. None of the parties appealed the settlement and, in an opinion dated November 22, 1978, fees were awarded.

The attorneys for the WRPH class requested fees totaling $1,550,000.00 out of a total settlement fund of $11 million (including interest). The Court awarded $1,140,000.00 to the Committee of counsel for the WRPH class, as well as costs of $33,246.95. This amounted to 10.6% of the settlement fund, with a range of fees from $15.00 to $200.00 an hour for counsel. The average

---

1. The fee application of Lane, Aitken, Dunner & Ziems is counted as separate and apart from the fee application of Dickstein, Shapiro & Morin.

2. This is the estimated value of the settlement fund which includes the $2.07 million from the Beecham defendants and $4 million from Bristol plus interest through mid-November. *See* September 14, 1981, Memorandum for Plaintiff Class Representative in Support of Settlement at 3.

hourly rate for that award was $121.00 before a multiple and $181.00 an hour after. *In Re Ampicillin Antitrust Litigation*, 81 F.R.D. 395 (D.D.C.1978).

As a result of the Supreme Court's decision in *Illinois Brick Company v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the consumer claims were dismissed by Court Order of July 5, 1978. This left the CCS plaintiffs and the United States as the remaining principal plaintiffs.

In the fall of 1978, it appeared to the Court that there was a likelihood of separate settlements of the claims of the CCS plaintiffs and the United States against the Beecham defendants. Accordingly, a preliminary hearing on the proposed CCS settlement was held on November 8, 1978, and the Court determined that the proposed settlement was within the range of possible approval. In addition, the Court ordered a hearing, pursuant to Fed.R.Civ.P. 23(e), to be held on April 6, 1979, for the purposes of determining whether the proposed CCS-Beecham settlement was fair, reasonable and adequate. The form of notice was approved on November 17, 1978, and mailed to all potential members of the litigating CCS class on or before January 15, 1979. The Court approved the CCS-Beecham settlement on May 2, 1979, thereby eliminating Beecham as a principal defendant from the case.

On September 22, 1980, the Court issued its mode of trial order with respect to the CCS-Bristol case. That Order provided, *inter alia*, for separate trials of the CCS plaintiffs' section 1 Sherman Act case, the Government's sections 1 and 2 Sherman Act case,[3] and finally the *Biocraft*[4] and *Zenith*[5] cases. It set the trial date for May 18, 1981. The trial of the CCS case was bifurcated first into a liability stage with damages to be tried later, if liability was found.

In addition, there were only a limited number of representative CCS cases selected for participation in the initial trial. (All CCS entities that were not originally transferred to this district for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 were transferred to this district for a consolidated trial with the consent of the parties on October 21, 1980, pursuant to 28 U.S.C. § 1404(a)). Those bellwethers were selected from those CCS entities with relatively complete bid records. On January 7, 1981, the Court selected New York City, Michigan, Washington, Texas, and Minnesota as the bellwethers for the May 18, 1981, trial.

Jury selection began on May 19, 1981 (one day late) for the commencement of this liability trial. After two weeks of trial under a very strenuous schedule, the parties reached a settlement agreement.

### SETTLEMENT

The CCS plaintiffs and the Beecham defendants entered into a settlement agreement on November 1, 1978. The Court approved the CCS-Beecham settlement on May 2, 1979. That agreement provided for settlement of claims based on the antitrust violations with regard to ampicillin and other semisynthetic penicillin drugs which have been or might be asserted against the Beecham defendants by the CCS plaintiffs and classes in this litigation, and by potential similar plaintiffs in other political entities of the United States. Beecham gave the plaintiffs certain economic relief and other cooperation in return for its dismissal. Beecham established a fund of $2,070,000.00, with interest at the average prime rate from November 1, 1978, on behalf of the classes. That amount was not to be distributed to class members until the settlement or final adjudication of the CCS

---

3. The *U.S. v. Bristol-Myers*, 82 F.R.D. 655, settlement was approved by the Court on October 13, 1981, wherein Bristol paid to the United States the sum of $3 million, plus other injunctive relief.

4. *Biocraft Laboratories, Inc. v. Bristol-Myers Company, et al.*, No. 70–1002, which is the only active case left in the *Ampicillin* litigation.

5. *Beecham Group, Ltd. v. Zenith Laboratories, Inc.*, 70–2453, which settled on September 28, 1981. (Consent decree approved by the Court on October 27, 1981).

case against Bristol, so as to preserve the fund against the expense of two separate distributions. The fund continues to earn interest until final distribution. The settlement agreement also contained a most-favored-nations clause, by which the fund would have been reduced proportionally if the CCS plaintiffs had settled with Bristol for less than $6.44 million before October 31, 1980, or more than 30 days before a firm trial date. In addition, Beecham assisted the plaintiffs in the prosecution of their case against Bristol, by helping them to obtain the deposition and trial testimony of certain Beecham employees and former employees.

The settlement agreement with Bristol, approved by the Court on June 18, 1981, provided that Bristol would pay the sum of $4 million to the CCS plaintiffs in full and final settlement of all their claims based on the alleged violations of the antitrust laws with regard to ampicillin and other semisynthetic drugs which have been or might have been asserted against Bristol by the CCS plaintiffs and classes in this litigation and by potential similar plaintiffs in other political entities of the United States. Since this was a class action, the Court held three hearings on September 22, 1981, for the purposes of considering: (1) whether the proposed Bristol-CCS Settlement Agreement was fair, reasonable and adequate; (2) what allowances should be made for the fees and expenses of the various attorneys for the CCS class representatives chargeable to the settlement funds generally and the manner in which such allowances should be allocated among the various CCS plaintiffs and classes; and (3) whether the interstate allocation of the settlement funds was fair, reasonable and adequate and thus

should be approved. The proposed settlement of the CCS claims and the proposed interstate allocation of the settlement funds were approved by the Court on October 2, 1981, without objection. This leaves only the question of allowances for attorneys' fees and costs, which will be hereinafter discussed.

## DISCUSSION

The parties have submitted the following schedule in their request for attorneys' fees:

### Dickstein, Shapiro and Morin

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Shapiro | 3,378.75 | 200 | $ 675,750.00 |
| Springer | 5,236.75 | 135 | 706,961.25 |
| Galligan | 381.00 | 135 | 51,435.00 |
| Helm | 6,494.50 | 90 | 584,505.00 |
| Morgan | 2,947.25 | 85 | 250,516.25 |
| Stark | 1,281.75 | 85 | 108,948.75 |
| Ruben | 72.75 | 90 | 6,547.50 |
| Schaeffer | 25.75 | 85 | 2,188.75 |
| Stevens | 21.50 | 85 | 1,827.50 |
| Mack | 160.50 | 85 | 13,642.50 |
| Adams | 167.75 | 85 | 14,258.75 |
| Perrin | 370.75 | 85 | 31,513.75 |
| O'Leary | 506.00 | 100 | 50,600.00 |
| Flegal | 111.25 | 100 | 11,125.00 |
| Student Law Clerks | 980.25 | 35 | 34,308.75 |
| Summer Associates | 67.00 | 35 | 2,345.00 |
| Paralegals | 14,733.00 | 35 | 515,655.00 |
| | 36,936.50 | | $3,062,128.75 |
| Less [6] | 2,108.43 [7] | | 175,000.00 |
| | 34,828.07 | | $2,887,128.75 [8] |

### Lane, Aitken, Dunner & Ziems [9]

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Dunner | 622.97 | 165 | $ 102,790.05 |
| Aitken | 10.50 | 165 | 1,732.50 |
| Hennessey | 15.90 | 95 | 1,510.50 |
| Krieger | 68.20 | 95 | 6,479.00 |
| Loud | 31.80 | 80 | 2,544.00 |
| Boland | 54.75 | 95 | 5,201.25 |
| Bajefshy | 773.94 | 95 | 73,524.30 |
| Paralegals | 115.53 | 35 | 4,043.55 |
| | 1,693.59 | | 197,825.15 |

6. The Court must take into account the $175,-000.00 partial fees already awarded in the WRPH settlement.

7. This is a proportionate reduction of hours based on an $83.00 average hourly rate, i. e.

$$3,062,128.75/36,936.50 = 83.00$$
$$- \ 175,000.00/ \ 2,108.43 = 83.00$$
$$2,887,128.75/34,828.07 = 83.00$$

8. The total amount of fees sought in this application for Dickstein, Shapiro & Morin is $2,887,128.75. This is calculated by deducting the $175,000.00 previously awarded to the firm by Court Order dated July 27, 1979.

9. Though this application is included in the Dickstein, Shapiro & Morin application, the Court will segregate it as a separate application in order to make a specific award to the Lane firm.

### Freeman, Roth, Freeman & Salzman

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Freeman | 288.50 | 200 | 57,700.00 |
| Hammond, III | 74.60 | 175 | 13,055.00 |
| Freeman, Jr. | 708.00 | 155 | 109,740.00 |
| Lewis | 258.60 | 155 | 40,083.00 |
| Salzman | 36.15 | 155 | 5,603.25 |
| Myer | 45.50 | 150 | 6,825.00 |
| Voortman | 825.70 | 120 | 99,084.00 |
| Colleton | 28.70 | 115 | 3,300.50 |
| Kinney | 88.50 | 105 | 9,292.50 |
| Krammer | 53.50 | 100 | 5,350.00 |
| Paralegals | 493.50 | 35 | 17,272.50 |
| Paralegals . | 18.50 | 30 | 555.00 |
| | 2,919.75 | | $ 367,860.75 |

### Kohn, Milstein, & Cohen

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Kohn | 12.00 | 270 | $ 3,240.00 |
| Cohen | 649.00 | 165 | 107,085.00 |
| Milstein | 16.00 | 145 | 2,320.00 |
| Toll | 162.50 | 85 | 13,812.50 |
| Baizer | 268.00 | 55 | 14,740.00 |
| Hausfeld | 734.00 | 120 | 88,080.00 |
| Van Susteren | 899.00 | 35 | 31,465.00 |
| | 2,740.50 | | $ 260,742.50 |

### State of California

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Spiegel | 276.00 | 110 | $ 30,360.00 |
| Cutler | 1,804.00 | 90 | 162,360.00 |
| Jones | 100.00 | 25 | 2,500.00 |
| Wychoff | 50.00 | 25 | 1,250.00 |
| | 2,230.00 | | $ 196,470.00 |

### Chestnut & Brooks

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Chestnut | 49.60 | 175 | $ 8,680.00 |
| Beline | 405.90 | 150 | 60,885.00 |
| Stringer | 424.00 | 100 | 42,400.00 |
| Cambronne | 138.90 | 100 | 13,890.00 |
| Malone | 26.60 | 60 | 1,596.00 |
| Kilgriff | 7.60 | 100 | 760.00 |
| Nolte | 125.30 | 35 | 4,385.50 |
| Wahl | 41.20 | 35 | 1,442.00 |
| Oberle | 2.50 | 35 | 87.50 |
| | 1,221.60 | | $ 134,126.00 |

### State of Washington [10]

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Boeder | 391.95 | 75 | $ 29,396.25 |
| Bright | 25.25 | 75 | 1,893.75 |
| Ellis | 17.50 | 75 | 450.00 |
| Ferguson | 56.00 | 75 | 4,162.50 |
| Hereford | .50 | 75 | 37.50 |
| Ross | 15.90 | 60 | 954.00 |
| Welch | 74.00 | 30 | 2,220.00 |
| McLean | 8.00 | 20 | 160.00 |
| | 589.10 | | $ 39,274.00 |

### Berger & Montague

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Montague, Jr. | 50.75 | 175 | $ 8,881.25 |
| Mulloy | 8.50 | 160 | 1,360.00 |
| Davidoff | 2.00 | 125 | 250.00 |
| Meredith | 25.50 | 110 | 2,805.00 |
| Steifel | 2.00 | 90 | 180.00 |
| McMahon | 14.25 | 75 | 1,068.75 |
| Paralegals | 141.50 | 35 | 4,952.50 |
| | 244.50 | | $ 19,497.50 |

### State of Massachusetts

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Greenfogel | 22.75 | 90 | $ 2,047.50 |
| Kovacs | 53.75 | 75 | 4,031.25 |
| Rosen | 7.00 | 60 | 420.00 |
| Bishop | 8.00 | 60 | 480.00 |
| Kelly | 25.00 | 5 | 125.00 |
| Dillon | 25.00 | 5 | 125.00 |
| Trahon | 25.00 | 5 | 125.00 |
| | 166.50 | | $ 7,353.75 |

### State of Texas

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Aaker | 56.25 | 100 | $ 5,625.00 |
| Thomas | 8.50 | 25 | 212.50 |
| Henley | 84.25 | 5 | 421.25 |
| | 149.00 | | $ 6,258.75 |

### Harrison, Myers, Singer, & Lerch

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Harrison | 5.70 | 125 | $ 712.50 |
| Paralegals | 8.70 | 35 | 304.50 |
| | 14.40 | | $ 1,017.00 |

As shown above, the attorneys seek $4,117,553.65 in fees, as well as out-of-pocket expenses of $332,714.85 for a total award of $4,450,268.50. This total amounts to approximately 61% of the settlement fund of $7.3 million, which is more than the 50% maximum as set forth in the notice of settlement. *See* June 18, 1981 General Settlement and Order No. 1, Exhibit C, page 4 and Exhibit D, page 5. Accordingly, the first step the Court must undertake is a determination of the percentage of the settlement fund to be used for fees and expenses. In examining fee awards in other antitrust actions, the Court finds that the bulk of the fee awards are less than 25% of the settlement fund. *See In re Armored Car Antitrust Litigation*, 472 F.Supp. 1357 (N.D.Ga.1979) (2.2% of the settlement fund); *In re Anthracite Coal Antitrust Liti-*

10. Though the hourly rates claimed are historical, the Court finds that it is unnecessary to convert to current hourly rates as the Court will use the same average hourly rate for all counsel as explained below.

*gation,* 81 F.R.D. 499 (M.D.Pa.1979) (20% of the settlement fund); *In re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305 (D.Md.1979) (22.2% of the settlement); *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245 (N.D.Ill.1979) (6.6% of the settlement fund); and *Trist v. First Federal Savings and Loan Ass'n. of Chester,* 89 F.R.D. 8 (E.D.Pa.1980) (25% of the settlement fund). However, this is not to say that the Court is bound by any set limitation on the fee award. There have been several cases where courts have awarded more than 40% of the settlement fund for fees and expenses. *See Beech Cinema Inc. v. Twentieth Century Fox Film Corp.,* 480 F.Supp. 1195 (S.D.N.Y.1979) (53.2% of the settlement fund) and *Aamco Automatic Transmissions Inc. v. Tagloe,* 82 F.R.D. 405 (E.D.Pa.1979) (43.87% of the settlement fund). Indeed, some courts have awarded fees merely for the injunctive relief that was attained. In *Cantor v. Detroit Edison Co.,* 86 F.R.D. 752 (E.D.Mi.1980), the Court awarded fees in the amount of $679,-488.10 and costs in the amount of $51,711.65 even though the plaintiff class received no monetary award. *See also, Knutson v. Daily Review, Inc.,* 479 F.Supp. 1263 (N.D.Ca. 1979) (61,000% of the settlement fund).

Based upon a careful review of the facts of this case and the entire record herein, the Court will award 45% of the settlement fund of $7.3 million for a total of $3,285,-000.00.

■ Upon a determination of the applicable percentage to be used for the award, the Court is faced with the arduous task of cutting the total fee request of the attorneys involved by at least 16%. In attempting to arrive at an appropriate award, the general fee-setting inquiry usually begins with the "lodestar": the number of hours reasonably expended multiplied by a reasonable hourly rate. *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc).

The first problem is determining the reasonable number of hours expended by the plaintiffs' attorneys. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiators & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973). Upon careful consideration of the hours claimed by all of the attorneys involved and the fact that there was no opposition, the Court finds the hours to be reasonable. Indeed, the Court is impressed by the efficiencies of counsel in presenting their case without duplication of effort,[11] despite the tenacity of defense counsel.

■ Upon determining the reasonable hours expended by plaintiffs' attorneys, the remaining element in fixing a lodestar fee is the reasonable hourly rate. *Copeland v. Marshall, supra* at 892. However, this is complicated by the fact that the Court would have to drastically cut the hourly rate charged by all counsel. This would result in inequities for those counsel who requested a more reasonable hourly rate. This is further complicated by the fact that the Court has already awarded a maximum of $200.00 an hour in the fee award for the WRPH case, which would lead to a consistency problem. One option open to the Court is to follow the opinion of Judge Freeman in the *Armored Car Litigation, supra,* in which he chastised many of these same attorneys for their exhorbitant fee request and then cut their request 77%—from $1,127,500.00 to $259,655.50. While the Court shares the view that attorneys' fees must be checked, the Court does not find such drastic action necessary here. However, the Court would be remiss if it did not point out that under no circumstances would it award a $275.00 hourly rate. Thus, the Court must adopt a different approach in order to arrive at an appropriate attorneys' fee award.

The Court finds that the best method will be to assign an average hourly rate for all

---

**11.** While the Court presumes that there are some duplicative and/or unproductive hours included in each of the fee petitions, deletion of these hours would be an exercise in futility, as the Court is awarding a set percentage of the settlement fund.

compensable hours worked. Presently, each application can be broken down as follows:

| Firm | Average Hourly Rate |
|---|---|
| Dickstein, Shapiro & Morin | $ 83.00 |
| Lane, Aitken, Dunner & Ziems | 117.00 |
| Freeman, Roth, Freeman & Salzman | 126.00 |
| Kohn, Milstein & Cohen | 95.14 |
| State of California | 88.10 |
| Chestnut & Brooks | 110.00 |
| State of Washington | 67.00 |
| Berger & Montague | 80.00 |
| Commonwealth of Massachusetts | 44.00 |
| Attorney General of Texas | 42.00 |
| Harrison, Singer & Lerch | 71.00 |
| Total Average Hourly Rate | $88.00 [12] |

Based upon the record herein and the pleadings, the Court will adopt an average hourly rate of $55.00 per hour as a fee award of less than forty-five per cent (45%) of the total settlement fund:

| Firm | Amount |
|---|---|
| Dickstein, Shapiro & Morin | $1,915,543.85 |
| Lane, Aitken, Dunner & Ziems | 93,147.45 |
| Freeman, Roth, Freeman & Salzman | 160,586.25 |
| Kohn, Milstein & Cohen | 150,727.50 |
| State of California | 122,650.00 |
| Chestnut & Brooks | 67,188.00 |
| State of Washington | 32,400.50 |
| Berger & Montague | 13,447.50 |
| Commonwealth of Massachusetts | 7,353.75 |
| Attorney General of Texas | 6,258.75 |
| Harrison, Singer & Lerch | 792.00 |
| Total | $2,570,095.55 |

As seen above, the total amount of attorneys' fees is $2,570,095.55, plus costs of $332,714.85 for a total of $2,902,810.40. This leaves a balance of $382,189.60 when 45% of the settlement fund is used. While the parties agreed not to seek a multiple, the Court finds that such a system is necessary in order to appropriately divide the remaining funds and create a more equitable distribution of the settlement fund.

In determining how to divide up the remaining balance of $382,189.60, the Court will follow and expand on the guidelines of *Copeland, supra* at 906–7. That is, the Court will award points [13] to each of the firms that meet the following criteria:

(1) the contingent nature of success;

(2) the delay in receipt of payment for services rendered;

(3) quality of representation; and

(4) the number of hours worked with particular emphasis on the later years of this litigation.

In dividing up this amount, the Court will first exclude from the sharing of the remainder each of the states, California, Washington, Massachusetts, and Texas. Indeed, each of the states except California received a higher proportionate share of their request than the average proportionate share of total fees awarded. Moreover, two states, Massachusetts and Texas, which should be commended for the reasonableness of their request, received 100% of their request; and a third, Washington, received 82% of their request. It is also shown below that the award to the State of California is also very reasonable.

The Court will eliminate the Harrison firm as well. As shown below, the Harrison firm received a proportionate share of their request higher than the average proportionate share of total fees awarded. The Court will likewise refuse to grant any incentive award to Lane, Aitken, Dunner & Ziems, as they were compensated by Dickstein, Shapiro & Morin for all hours expended at the rate of $50.00 per hour. *See* July 31, 1981 Fee Petition of Dickstein, Shapiro & Morin, Exhibit C. Moreover, the total fee award to the Lane firm of $55.00 per hour exceeds the total amount they were originally paid. The Court is satisfied that the fees awarded are more than reasonable. While the Court recognizes the valuable contributions each of the attorneys for each of the above provided, the size of the remainder is insufficient to satisfy the total fee requests of each counsel. Moreover, the risk of litigation for each of the states was diminutive as the attorneys were to be compensated regardless of the outcome, as employees of

---

**12.** Computed as follows: total fee request, $4,117,553.65 divided by total number of hours, 46,797.01 equals $88.00. These average hourly rates include the time of law clerks and paralegal assistants as well as attorneys.

**13.** Points are to be defined as percentages of the settlement fund. It is necessary that the settlement fund be divided through the distribution of the 100 points in lieu of multiples of each firm's fee request so as to ensure the exact distribution of the remaining funds.

the states. Additionally, it was their employers, the individual states that were to receive the major benefits of this litigation, i. e., sharing in the settlement.

The Court will *first* award points to the remaining private firms for the *risk* factor that the lawsuit would be unsuccessful and that no fee at all would be obtained. The first problem that is presented to the Court, however, is the contractual arrangements each firm had with its clients. Dickstein, Shapiro & Morin provided that information in which they pointed out that they received only $63,000.00 from the State of Wisconsin for all of their work, along with the $175,000.00 from the WRPH settlement. The rest of their compensation was to come from the settlement fund. Further, it was the Dickstein firm that had the most to lose in the event that the litigation proved unsuccessful as they expended the highest number of hours. Accordingly, the Court finds that the Dickstein, Shapiro & Morin firm will be accorded twenty (20) points for the risk factor.

The firm of Freeman, Roth, Freeman & Salzman represented five CCS plaintiffs in this consolidated litigation, the States of Illinois, Indiana, Tennessee, West Virginia and the Commonwealth of Pennsylvania. The firm of Kohn, Milstein & Cohen represented the State of Michigan, Chestnut & Brooks represented the State of Minnesota, and Berger & Montague represented the State of Delaware and certain other CCS plaintiffs. While the Court recognizes that each of these firms were on a contingency basis, as were the other firms who received no bonus points, there simply is not enough money to give them any bonus points for this factor. Moreover, it was the Dickstein, Shapiro & Morin firm that had the greatest number of hours involved and therefore the greatest risk. As shown below, the Court finds that the total fee award to each of the firms is completely fair, reasonable and adequate. Indeed, the purpose of the bonus system is to achieve an equitable distribution of the fee award, which is why the other law firms have not been accorded any bonus points at all. Thus, whether a firm was on a contingency fee basis is not deter-minative of the award under the circumstances of this case. Accordingly, the Court will award zero (0) points for this factor to the Freeman firm, the Kohn firm, the Chestnut firm, and the Berger firm.

The *second factor* that this Court will award points for is the *delay in receipt of payment*. As shown from the discussions above, this case was originally filed in 1970. Since that time, with the exception of the $175,000.00 received by Dickstein, Shapiro & Morin, and the Kohn firm's share of the WRPH fee award, counsel for these firms have received no compensation. Thus, the Court will award each of the firms named above, except the Berger firm, a five (5) point bonus for the work done on behalf of the CCS plaintiffs. Additionally, the Court will award an additional five (5) points to the Freeman firm, as most of their work was pre-1976.

The *third factor* which this Court will award points for is the *quality of representation*. It is unquestioned that all counsel throughout this litigation displayed a high degree of skill and competence in the representations of their respective clients. The lion's share of the points, however, for this factor must go to the Dickstein, Shapiro & Morin firm, for it was that firm that was lead counsel and at the forefront until the very end. It was principally that firm that dealt with able counsel for the defendant and was principally responsible for bringing about the settlement. Accordingly, the Court will award Dickstein, Shapiro & Morin twenty (20) bonus points. The remaining two firms, Freeman, Roth, Freeman & Salzman and Kohn, Milstein & Cohen, will receive five (5) points.

The *final factor* to be considered by the Court is the *amount of time* expended in the later years of the litigation. Unquestionably, the Dickstein, Shapiro & Morin and Kohn, Milstein & Cohen firms put in a tremendous number of hours in the later years. The Court will award twenty (20) points to the Dickstein, Shapiro & Morin firm, for it was they who put in the most time in the later years, to the exclusion of

other work for the attorneys involved, as well as throughout this litigation. Despite the fact that the Kohn, Milstein & Cohen firm put in 90% of their hours in 1980–81, the Court will not award any additional points, as it would result in an inequitable total fee award. The remaining five (5) points will be awarded to the Freeman firm in order to make their award more equitable.

Based upon the foregoing, the Court will award the following points:

| | |
|---|---|
| Dickstein, Shapiro & Morin | 65 points |
| Freeman, Roth, Freeman & Salzman | 20 points |
| Kohn, Milstein & Cohen | 10 points |
| Chestnut & Brooks | 5 points |

This amounts to an additional fee award of:

| | |
|---|---|
| Dickstein, Shapiro & Morin | $248,423.24 |
| Freeman, Roth, Freeman & Salzman | 76,437.92 |
| Kohn, Milstein & Cohen | 38,218.96 |
| Chestnut & Brooks | 19,109.48 |

Accordingly, based upon the foregoing and the entire record herein, the Court will award the following total fees:

| Firm | Total Fee Award | Percentage of Request |
|---|---|---|
| Dickstein, Shapiro & Morin | $2,163,967.09 | 75% |
| Lane, Aitken, Dunner & Ziems | 93,147.45 | 47% |
| Freeman, Roth, Freeman & Salzman | 237,024.17 | 64% |
| Kohn, Milstein & Cohen | 188,946.46 | 72% |
| State of California | 122,650.00 | 62% |
| Chestnut & Brooks | 86,297.48 | 64% |
| State of Washington | 32,400.50 | 82% |
| Berger & Montague | 13,447.50 | 69% |
| Commonwealth of Massachusetts | 7,353.75 | 100% |
| State of Texas | 6,258.75 | 100% |
| Harrison, Singer & Lerch | 792.00 | 78% |
| Total | $2,952,285.15 | 72% [14] |

In determining the fees applicable to each firm, the Court is not insensitive to the fact that certain firms were cut back more than others. However, in determining the adequacy of the fees awarded, the Court first examined the percentage of the original fee request awarded. That is, the Court awarded fees amounting to 72% of the total amount of fees requested. Of the eleven fee petitions received, five firms received more than the 72%, one firm received exact-

ly 72% and one firm received only 3% less than the 72% average. However, for purposes of this award, a three percent plus or minus difference falls within the relevant range of allowable fees. It is no coincidence that the remaining firms have four of the top five average hourly rates. Indeed, the adequacy of this award is even more obvious when based on the following.

The first firm, Freeman, Roth, Freeman & Salzman claimed the highest average hourly rate of $126.00. Had the Freeman firm used a more reasonable rate, such as the $83.00 rate claimed by the Dickstein firm,[15] their total fee request would have been $242,339.25, which would have led to an award of 98% of their request. Even if the Freeman firm had used the second highest average hourly rate of $117.00, their total fee request would have amounted to $341,610.75 or 69% of their request. This would have fallen within the Court's plus or minus 3% figure.

The second highest average hourly rate is claimed by Lane, Aitken, Dunner & Ziems of $117.00. For the reasons as set forth above, the Court did not add any incentive award to their request. However, the Court notes that had the Lane firm used the $83.00 average of the Dickstein firm, their total fee request would have amounted to $140,567.97 or 66% of their request. While this is less than the plus or minus 3% range as imposed by the Court, it shows that the award is more than reasonable.

The third highest average hourly rate of $110.00 belongs to Chestnut & Brooks. Once again, the Court notes that had the Chestnut firm used the $83.00 rate, their total fee request would have amounted to $101,392.80 or 76% of their total request.

The last "firm" is the State of California. The Court again denied an incentive award as explained above. Nevertheless, if the State of California had used the $83.00 rate, their total fee request would have amount-

---

14. The average percentage of the total fee requested awarded was computed as follows: total fees awarded divided by the total fees requested, or $2,952,285.15 divided by $4,117,553.65, which equals 72%.

15. This is not to say that the Court is in total agreement with their request; it is merely used for comparison purposes.

ed to $185,090.00 or 71%, which is only 1% less than the average reduction.

Accordingly, upon consideration of the entire record herein, the Court is satisfied that the fees awarded are fair and reasonable.

The *final element* for the Court to consider is the *issue of reasonable expenses.* In reviewing the fee petitions, the Court is satisfied that the requests for costs are totally reasonable. Accordingly, the Court will reimburse the firms for costs as follows:

| | |
|---|---|
| Dickstein, Shapiro & Morin [16] | $264,326.21 |
| Freeman, Roth, Freeman & Salzman | 19,631.73 |
| Kohn, Milstein & Cohen | 8,257.55 |
| State of California | 9,730.00 |
| Chestnut & Brooks | 15,556.66 |
| State of Washington | 7,552.18 |
| Berger & Montague | 3,558.77 |
| Commonwealth of Massachusetts | 808.20 |
| State of Texas | 3,257.78 |
| Harrison, Singer & Lerch | 35.77 |
| Total Costs | $332,714.85 |

Thus the total amount of fees and expenses to be awarded by the Court to each firm is as follows:

16. For purposes of costs, the Court will include the application of Lane, Aitken, Dunner & Ziems in the application of Dickstein, Shapiro & Morin since the Dickstein firm indicated that it will allocate the total costs awarded in the appropriate manner.

17. The residual CCS settlement class is defined as follows: the Commonwealth of Massachusetts (as class representative), the States of Alaska, Idaho, Maine, Maryland, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, South Carolina, Utah and Wyoming, the Territories of Guam and the Virgin Islands, and all cities, counties and other political subdivisions (including hospital and welfare districts) in the aforesaid States and Territories and in the State of Connecticut that have purchased or paid for ampicillin or other semisynthetic penicillin drugs.

18. The litigating CCS settlement class is defined as those entities that were a part of this litigation, i. e., had filed suit or were members of the class.

19. The residual CCS class members' share in the settlement fund is 15.4463%. *See* Final Judgment, October 2, 1981, at 5. Thus, based on a $7.3 million settlement fund, the residual CCS class members are to receive $1,127,-

| | |
|---|---|
| Dickstein, Shapiro & Morin | $2,428,293.30 |
| Lane, Aitken, Dunner & Ziems | 93,147.45 |
| Freeman, Roth, Freeman & Salzman | 256,655.90 |
| Kohn, Milstein & Cohen | 197,204.01 |
| State of California | 132,380.00 |
| Chestnut & Brooks | 101,854.14 |
| State of Washington | 39,952.68 |
| Berger & Montague | 17,006.27 |
| Commonwealth of Massachusetts | 8,161.95 |
| State of Texas | 9,516.53 |
| Harrison, Singer & Lerch | 827.77 |
| Total | $3,285,000.00 |

The total of $3,285,000.00 in fees and expenses shall be allocated among the residual classes [17] and the litigating CCS plaintiffs and classes [18] as follows:

(a) Sixty-five (65) percent of the residual class share [19] of the CCS settlement fund will be used for the payment of common fees and expenses.[20]

(b) The remaining fees and expenses will be charged *pro rata* among the litigating CCS plaintiffs and classes.[21]

An Order in accordance with the foregoing shall be issued at the time the settlement becomes final and the settlement fund exceeds $7.3 million. Accordingly, during the interim, liaison counsel is to advise the Court, within five days from the date here-

579.90, of which 65% will be used to pay the common fees and expenses as set out above, or $732,926.94. This leaves a balance of $394,-652.96 for distribution to the residual CCS class members per the allocation schedule as set out in the Final Judgment, *supra.* (The figures will, of course, be adjusted depending on the actual settlement fund.)

20. The Court notes that a straight *pro rata* distribution among *all* CCS entities would have the effect of giving the residual class members a larger net recovery than the litigating class members, since the residual class members have had no expenses at all for deduction from their individual shares of the funds. *See* July 31, 1981, Shapiro Affidavit ¶ 35C. Moreover, the residual class members incurred no risk in this litigation with respect to costs, and, thus, any money received is a "windfall."

21. The litigating CCS plaintiffs' and classes' share in the settlement fund of $7.3 million is 84.5537% or $6,172,420.10. The remaining fee and expenses of $2,552,073.06 will be allocated on a *pro rata* basis among the litigating CCS classes and individual CCS plaintiffs. (The figures will, of course, be adjusted depending on the actual settlement fund.)

of, when the two above-mentioned events are to occur.